UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| KENTON JONES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:18-CV-21-REW-HAI |
| | ) | |
| v. | ) | OPINION & ORDER |
| | ) | |
| PROGRESSIVE CASUALTY | ) | |
| INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Defendants. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

A variety of protections extend to employees after on-the-job injuries. Employers must navigate such safeguards before getting an injured employee back to work. The success of the efforts comes down to effective communication between all involved parties. Crossed wires sparked this suit.

Employer and employee were never on the same page. The parties' clumsy dialogue led to a premature return to work and, ultimately, a termination. Plaintiff solely blames his former employer, now adverse litigant, for the bungling. Defendant attributes fault entirely to Plaintiff's alleged deception and shirking. As the Court sees the record, the truth lies somewhere in the middle. Defendant's team did not adequately broadcast (or even comprehend) Plaintiff's FMLA status or account for schematic protections in bringing Plaintiff back on board. But Plaintiff, whether through unintentional misstatements or willful deceit, gave Defendant ample grounds to fire him. Accordingly, the Court, at this summary judgment stage, dismisses most of Plaintiff's voluminous claim slate, but sees a record that, under the applicable standards, does not wholly absolve Defendant of liability as a matter of law.

1

# I.    BACKGROUND

On December 19, 2016, Plaintiff Kenton Jones fell while inspecting a cattle trailer for his job as a Claims Adjuster for Defendant Progressive.[1] *See* DE 60-9 at 14 (December 20, 2016, Jones e-mail). The tumble injured Jones's shoulder and back. *See* DE 60-10 at 2 (Rockcastle Cty. Regional Hosp. Records). A treating physician excused Jones from work until December 26, 2016. *Id.* at 5. At a December 28, 2016, follow-up, Dr. Carol McFadden (a nurse practitioner) authorized Jones, with certain restrictions, to return to work immediately. *See* DE 60-13 at 1 (Baptist Health Workers' Comp Form). A week later, Dr. McFadden marginally reduced these restrictions. *Id.* at 2. Jones had vacation anyway until January 2. *See* DE 60-11 (December 12, 2016, Jones e-mail).

On January 5, 2017, Progressive, on McFadden's certification, approved Jones for Family and Medical Leave Act ("FMLA") leave from December 19, 2019, to January 31, 2017. *See* DE 64-1 (FMLA Approval Notice). However, on several occasions in early January, Progressive employees contacted Jones regarding a return to work. On January 2, 2017, Jones's supervisor John Watson e-mailed: "I had received a notification that you would be back today? Any update you can provide?" DE 60-9 at 21. Jones advised that he was awaiting medical paperwork and that "they have taken me off work longer than expected." *Id.* at 20 (Jan. 2, 2017, Jones e-mail to Watson). The next day, Progressive Leave Specialist Sharon Kemp e-mailed Jones: "I just wanted to make sure that you have made it back to work." *Id.* at 22. On the morning of January 5, 2017, Kemp called Jones

<hr />

[1] Specifically, Progressive Casualty Insurance Company. Plaintiff also initially sued Progressive Specialty Insurance Agency, Inc. ("Specialty"). *See* DE 25 at 1 (Complaint). However, Progressive's claim that Jones, on December 10, 2018, agreed to dismiss his claims against Specialty, with prejudice, stands undisputed. *See* DE 61-1 at 1 n.1 (Mem. Supp. Mot. Summ. J.); *see generally* DE 64 (Resp.). Accordingly, the Court refers to the sole remaining Defendant as simply "Progressive." The Court dismisses Specialty.

and advised that Progressive HR Consultant Jennifer Liebler believed that the Company could accommodate Dr. McFadden's restrictions. *See id.* at 31 (Jan. 5, 2017, Kemp e-mail memorializing call). Jones, who typically did field not desk work, raised doubts about any accommodations given that the injury limited use of his dominant hand. *Id.* Kemp advised that she would reach back out to Jones after confirming with HR and would "get him back to work as early as tomorrow." *Id.* Later that day, Kemp e-mailed notice that Progressive was "able to accommodate" Dr. McFadden's restrictions and that it would "expect" Jones to return to normal working hours the next morning. *Id.* at 33 (e-mail). Jones did not (at that time) receive Kemp's afternoon message. *See* DE 64-20 (Jones's recording of Jan. 17, 2017, call) at 02:30 (Jones denying receiving Progressive communications on the afternoon of Jan. 5, 2017).

On Friday, January 6, 2017, Liebler called Jones to confirm the Company accommodations and relayed Progressive's expectation that Jones return in a light-duty role on Monday, January 9. DE 64 (Pl.'s Resp.) at 4; DE 60-9 at 39 (Jan. 6, 2017, Liebler e-mail memorializing call). Jones advised Liebler that he was unable to return on January 9, 2017, because of an intervening personal trip to Arizona. DE 64 at 4. Thus, Liebler (seeded with doubt) advised that Progressive would expect Jones back on January 11. *Id.* Liebler quietly began a probe that day. *See* DE 60-9 at 2 (Liebler notes).

When Jones returned on January 11 for light duty, his supervisor (Watson) sent him eleven requirements for the modified role. DE 64-15 (Watson e-mail to Jones: "Light Duty Assignment Requirements / Expectations"). Progressive's daily expectations included, as relevant here, that Jones: (1) e-mail Watson each day at 8:30 to confirm he was at work, (2) complete a spreadsheet tracking "each claim" Jones worked on, and (3)

send Watson the updated spreadsheet each day by 5:15. DE 64-15. The same day, Liebler, Watson, and (Watson's supervisor) Christopher Leissner interviewed Jones about certain perceived discrepancies in Jones's Arizona trip explanation and the resulting delay in his return to work. DE 60-9 at 7 (Liebler notes). Though Leissner and Watson later corroborated much of Liebler's narrative, Jones disputes many statements that Liebler's January 11 notes attribute to him.

Progressive worried that Jones had deceptively avoided a work return. The Company perceived that Jones actively misled it with respect to his work release status. Further, Jones planned a private Arizona trip—thus intending to be away—while the Company worked to bring him back into the office. Jones either did not promptly disclose the trip or was dodgy on the details and sequence. Jones knew Kemp was confirming the Progressive accommodations for him on January 5, with intent that he return to work on January 6. Despite that, he said nothing to Kemp about going to Arizona. Further, on January 6, Jones gave the impression, a misdirecting one, that he was in or en route to Arizona. His plane did not depart Kentucky until hours **after** his conversation with Liebler on January 6 (and he arrived in Cincinnati the night **before** the Liebler call).

Liebler investigated based on her recollection of the January 11 call. Jones provided his January 4, 2017, booking information for a 2:26 p.m., January 6, 2017, flight from Cincinnati, Ohio, to Phoenix, Arizona. DE 60-9 at 53 (Jan. 13, 2017, Jones e-mail to Liebler); *id.* at 55 (image reflecting itinerary). On January 17, 2017, the same Progressive team conducted a second phone interview, which Jones secretly recorded. *See* DE 64-20 (Jones's recording). On the call, Liebler focused primarily on perceived

Jones lies regarding his ticket purchase and Arizona departure dates. *Id.* Jones maintained, throughout, that he did not lie and suggested that any discrepancies were simply a result of misremembering, unintentional misstatements, or because he was "caught off guard." *See, e.g.*, *id.* at 16:35 & 18:00. Progressive, unpersuaded, ultimately terminated Jones for lack of integrity during the January 17 call. *Id.* at 16:00. Jones vowed to sue.

Based on these events and certain subsequent Progressive conduct,[2] Jones seeks recovery under thirteen separate theories. *See* DE 25 at 4–11 (Amended Complaint). He alleges: FMLA interference (Count I); FMLA retaliation (Count II); intentional (Count III) and negligent (Count IV) infliction of emotional distress; negligence/vicarious liability (Count V); breach of contract (Count VI); conversion (Count VII); a KRS 337.385 wage violation (Count VIII); Kentucky workers' compensation retaliation (Count IX); interference with contract (Count X); wrongful use of administrative proceedings (Count XI); negligence per se (Count XII); and punitive damages (Count XIII). *Id.* Progressive pursues summary judgment on each claim. DE 60 (Motion). The motion is fully briefed and ripe for review. DE 64 & 69 (Response & Reply).

## II. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.

---

[2] This foregoing recitation summarizes the primary factual landscape for Jones's suit. However, Jones brings several claims based on Progressive's post-termination conduct. The Court, for brevity's sake, reserves factual summaries regarding such events for the point in the Court's analysis where they are directly relevant.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's

evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

## III.  DISCUSSION

### A.  FMLA Claims

Jones alleges two distinct FMLA theories: interference,[3] DE 25 at ¶¶ 20–24, and retaliation,[4] *id.* at ¶¶ 25–28. The Sixth Circuit provides the essential claim elements:

---

[3] Per the statute: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

To prevail on an interference claim under the FMLA, an employee must show: "(1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012) (citation omitted). To establish a prima facie case of retaliation under the FMLA, [a plaintiff] "must show that (1) he engaged in an activity protected by the Act; (2) Defendant took an adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Id.* at 842 (citation omitted).

*Hodnett v. Chardam Gear Co., Inc.*, 749 F. App'x 390, 393–94 (6th Cir. 2018). Absent

direct evidence, the prevailing *McDonnell Douglas* burden-shifting framework applies to

FMLA retaliation and interference claims. *See Groening v. Glen Lake Cmty. Sch.*, 884

F.3d 626, 630 (6th Cir. 2018) (Plaintiff "offers circumstantial evidence to support this

[retaliation] claim, so we apply the *McDonnell Douglas* burden-shifting framework.");

---

[4] The relevant provision states: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Plaintiff, consistent with prevailing Circuit treatment, expressly taps his retaliation claim as falling under (a)(2). *See* DE 25 at 5; *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019) (citing (a)(2) in FMLA retaliation context); *Nowlin v. Nova Nordisk Inc.*, No. 17-5507, 2018 WL 1805141, at *2 (6th Cir. Feb. 28, 2018) ("The retaliation theory arises from § 2615(a)(2)[.]"); *Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) (citing (a)(2) as "FMLA's anti-retaliation statute"). The Court notes, however, that a retaliation claim like Jones's—*i.e.*, alleged termination for exercising FMLA rights—is a poor fit for the (a)(2) verbiage. Certainly (a)(2) prohibits "discharge" and discrimination, but it does so only for employees that "oppos[e]" an FMLA-barred practice. "Being fired for *taking* FMLA leave cannot easily be described as 'opposing any practice made unlawful' by the FMLA." *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 167 (2d Cir. 2017). Rather, as the Second Circuit (and the Labor Department) have concluded, "adverse employment action in the face of a lawful exercise of FMLA rights fits comfortably within § 2615(a)(1)'s 'interfere with, restrain, or deny' language." *Id.*; *see also* The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67,934, 67,986 (Nov. 17, 2008) ("[T]he Department believes that section 2615(a)(1) provides a clearer statutory basis for . . . prohibition of . . . retaliation."). That said, the defense does not argue this theory, and the published Sixth Circuit precedent binds this Court. Even if that were not the case, the long-standing elements for the underlying retaliation claim, whatever the statutory basis, would surely remain unchanged.

*Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) ("[A] plaintiff's success in establishing her prima facie [interference] case does not create a strict liability regime for employers[.]"). Under this rubric, an employer confronting a facially valid claim may proffer "a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008). A plaintiff must rebut an employer's qualifying proffer "by a preponderance of the evidence." *Id.* The employee must, alternatively, show that the explanation "(1) has no basis in fact, (2) did not actually motivate . . . , or (3) was insufficient to warrant the challenged conduct." *Mullendore*, 872 F.3d at 328 (quotation marks and citation omitted).

### 1. Interference

As to the interference claim elements, Progressive disputes only the fifth. Specifically, Defendant contends that it gave Jones all statutorily required leave. DE 61-1 at 18–20. In response, Jones claims Progressive: (A) "chilled" his exercise of FMLA rights, (B) disciplined him for using FMLA time, and (C) forced him to return work during FMLA leave. DE 64 at 17–19. For various reasons, the Court rejects the first two theories but accepts the last.

*"Chilling"*

"Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220.[5] However, the mere possibility that "an employer's

---

[5] This opinion cites regulations that are "part of the administrative structure the Secretary [of Labor] devised pursuant to Congress' directive to issue regulations 'necessary to carry out' the [FMLA]. The Secretary's judgment that a particular regulation fits within this statutory constraint must be given considerable weight." *Ragsdale v. Wolverine World Wide, Inc.*, 122 S. Ct. 1155, 1159–60 (2002) (quoting 29 U.S.C. § 2654).

conduct might 'chill' use of FMLA leave is not enough[.]" *Bonfiglio v. Toledo Hosp.*, No. 3:16CV2163, 2018 WL 5761220, at \*12 (N.D. Ohio Nov. 1, 2018). Jones needed to offer proof that Progressive's conduct "in fact, caused h[im] or any other employee to refrain from requesting or using" such leave. *Id.* (citation and quotation marks omitted); *see also Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 454-55 (6th Cir. 2005). Because Jones fails to show any actual discouragement, his "chilling" theory fails. *See Ragsdale*, 122 S. Ct. at 1161 (The FMLA remedies provision "provides no relief unless the employee has been prejudiced by the violation[.]").

For instance, Jones alleges that it was "impossible for him to comply with all of his employer's contradictory requests" and that Kemp, Liebler, & Watson had "wildly different ideas about when and why Mr. Jones should return to work[.]" DE 64 at 17. True or not, Jones fails to connect either contention to actual repression of his FMLA use. Jones has always claimed that he came back to work as soon as he received an unequivocal direction to do so, *i.e.*, after Liebler explicitly confirmed that Progressive could accommodate his restrictions and would expect him back on January 11, 2017. *See* DE 64 at 4 (listing pre-return communications); DE 60-2 at 18 (Jones confirming that if they "told me to come back under these restrictions, then I would have come back"); DE 64-20 at 02:00 (Jones explaining that he did not advise Sharon Kemp that he could not return on January 5, 2017, because Kemp never confirmed that Progressive could accommodate his restrictions). Thus, whether or not Jones was confused about when Progressive expected him to return, there is no evidence that such a misunderstanding truncated his time off. Mix ups on Progressive's end, if anything, *extended* (from Jan. 4

to Jan. 11) Jones's leave.[6] Because Jones failed to produce any evidence that Progressive policies or conduct actually "chilled" his FMLA use, Defendant is entitled to summary judgment on this theory.[7] *See Archey v. AT&T Mobility Servs. LLC*, No. CV 17-91-DLB-CJS, 2019 WL 1434654, at *7 (E.D. Ky. Mar. 29, 2019) ("Plaintiff points to no evidence showing that she was deterred from pursuing FMLA leave as a result of AT&T's conflicting policies. . . . Therefore, the Court rejects this aspect of Plaintiff's FMLA-interference claim.").

---

[6] This case is also readily distinguishable from the company-policy-driven FMLA discouragement the court found actionable in *Harcourt v. Cincinnati Bell Telephone Co.*, 383 F. Supp. 2d 944 (S.D. Ohio 2005). Though Jones cites *Harcourt*, he identifies no FMLA-conflicting Progressive policies and, again, identifies no resulting prejudice.

[7] To the extent Plaintiff's "chilling" theory turns on the bare fact of Progressive contacting him, the claim is unavailing. DOL regulations unequivocally authorize many types of contact. 29 C.F.R. § 825.311(a) ("An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work."); *id.* at § 825.311(c) (An "employer may require that the employee provide the employer reasonable notice (i.e., within two business days) of [any] changed circumstances where foreseeable. The employer may also obtain information on such changed circumstances through requested status reports."). Further, "[n]othing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans." *Allen v. Butler Cty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009) (quoting *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 972 (7th Cir. 2000)).

Critically, Progressive was only able to effectively contact Jones during his leave on a few occasions. *Compare* DE 64 (Jones listing five Progressive communications during his leave: on Jan. 2, 3, 5 (twice), and 6, 2017), *with* DE 64-20 at 02:30 (Jones, on Jan. 17, 2017, denying receipt of Progressive communications on Jan. 5, 2017). All but one of Progressive's contacts related to requests for him to return on light duty, and the FMLA clearly allows contact about such offers. *See, e.g.*, 29 C.F.R. § 825.207 ("[T]he employee may decline the employer's offer of a light duty job."). Ultimately, Jones provides no evidence of any Progressive contacts falling outside the authorized boundaries for mid-leave communications. *See Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016) (granting summary judgment where "de minimis contact did little, if anything, to disrupt [employee]'s FMLA leave and did not discourage [employee] from taking FMLA leave").

*Discipline*

Jones also fails to establish that alleged "retaliatory conditions" after he returned to work denied him any benefits he was owed. First, the FMLA scheme permits employers to offer a "**light** duty assignment while [an employee is] recovering from a serious health condition." 29 C.F.R. § 825.220(d) (emphasis added). Progressive, through Watson, expressly tapped Jones's revised responsibilities as "Light Duty Assignment Requirements / Expectations[.]" DE 64-15 (Watson 1/11/17 e-mail to Jones). Second, and given Jones's claim that he was physically unable to perform his normal job responsibilities,[8] *see* DE 60-2 at 16 (Dep. at 16), the FMLA gave Plaintiff no right to reinstatement to his prior role (or, for that matter, any other position)—at least at that time. *See, e.g.*, 29 C.F.R. § 825.2169(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA."); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 245–46 (6th Cir. 2004) ("[T]he right to restoration does not arise unless the returning employee is able to perform the essential functions of the position or an equivalent."). Put simply, Progressive, by assigning modified light-duty responsibilities, did not deny Jones any "FMLA benefits to which he was entitled." *Romans*, 668 F.3d at 840.

Jones's alternative "discipline" theory, based on Progressive's investigation into the validity of his leave, is also fatally flawed. As with his "chilling" theory, Jones does not tether the investigation to any specific impairment of his FMLA rights. Jones does

---

[8] As well as his failure to provide a fitness-for-duty certification. *See* 29 C.F.R. § 825.312(a); DE 64-1 (FMLA Designation Notice: requiring such certification "to be restored to employment.").

not claim (and no evidence suggests) that but for the investigation he would have requested additional time-off. Further, in the Sixth Circuit, "employers are permitted to investigate their employees for wrongdoing, including wrongdoing related to protected leave." *Groening*, 884 F.3d at 631 (quoting *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) ("We have repeatedly held . . . that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action.")). Progressive did no more.

In sum, Progressive's modification of Jones's duties after his return was consistent with an FMLA authorized light-duty position. Given Jones's undisputed health status at the time, Progressive did not deny Plaintiff any FMLA entitlement by failing to restore him to his prior role. Nor did Progressive's investigation regarding dishonesty— *i.e.*, a "lawful, non-retaliatory bas[is] for termination"—itself interfere with Jones's FMLA rights. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012); *see Kitts v. Gen. Tel. N., Inc.*, No. 2:04-CV-173, 2005 WL 2277438, at *11 (S.D. Ohio Sept. 19, 2005) ("[N]othing in the FMLA prohibits an employer from investigating allegations of dishonesty[.]"). Finally, Plaintiff offers no rebuttal for Progressive's non-FMLA explanations for the investigation or light-duty modifications. *Grace*, 521 F.3d at 670 ("[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for

engaging in the challenged conduct." (quotation marks and citation omitted)).[9] Jones's discipline-based interference theories fail as a matter of law.

*"Forced" Return to Work*

Jones offers little to build on the conclusory assertion that Progressive forced him to return to work on January 11. *See* DE 64 at 19. Nonetheless, the Court finds the full record amply supportive, and the theory survives summary judgment. The key question, under the relevant regulation, is whether Progressive "coerced" Jones to return on light duty by, *e.g.*, making acceptance "a condition of employment." 29 C.F.R. § 825.220(d). An employer may offer an employee on FMLA leave a light-duty return, but the employer may not *demand* that such employee accept. *Id.* (authorizing "an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment"); *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 317 (6th Cir. 2018) ("Stein is correct that an employer may not require that an employee return to work once cleared for light duty if the employee has unexhausted FMLA leave.").

For proof on the issue, Jones relies on two sub-theories. First, he construes Watson's purported admission that Jones's termination was a result of absence on a (subsequently approved) FMLA day as proof that acceptance of light duty was mandatory. DE 64 at 15. Next, Jones argues that nobody from Progressive explicitly told him that he could continue his FMLA leave rather than accept the light-duty assignment. *Id.* Progressive, in reply, contends that Watson made no such concession and that Jones purportedly admitted that he returned to work voluntarily. DE 69 at 1–3.

---

[9] The Court addresses this alternative dismissal basis in greater detail in the retaliation analysis.

Both sides make too much of ambiguous deposition statements. Watson's statement hardly amounts to an admission that Progressive fired Jones because he failed to show up while on FMLA leave. Given the full deposition context, the Court finds that Watson's statement provides no more than a scintilla of evidence that the identified January 2 absence drove Progressive's termination decision. *See Staunch v. Continental Airlines, Inc.*, 511 F.3d 625, 628–29 (6th Cir. 2008) ("It is not sufficient for the party opposing summary judgment to present a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find in her favor."). Watson broadly stated on several occasions that Jones was terminated for dishonesty. DE 69-1 at 4 (Dep. at 24); *id.* at 9 (Dep. at 49). Watson, having already testified that he did not remember specific dates, merely confirmed what a document reflected, *i.e.*, that he believed Jones was supposed to be at work on January 2. *See* DE 64-16 at 4 (Dep. at 54); *id.* at 5 (Dep. at 25); DE 69-1 at 7 (Dep. at 39). Jones treats this one-off statement from an admitted date-amnesic manager as indicative directly of intent. The Court is unpersuaded.

The communications indicate that Watson *believed* Jones was supposed to be back on January 2, 2017. DE 60-9 at 21 (Jan. 2, 2017, Watson e-mail to Jones: "I had received a notification that you would be back today? Any Update you can provide?").[10] However, nothing about the tone of Watson's communication or Jones's response suggests that either believed a January 2, 2017, return was mandatory. *See id.* (Jan. 2, 2017, Jones e-mail to Watson: "Mr. Wats[,] Hello sorry I was waiting to get the paperwork back from the Doctor they have taken me off work longer than expected[.]").

---

[10] This was likely based on a December 27 e-mail from the Travelers Workers' Compensation department indicating that Jones "plans to [return to work] after vacation on 1/2/17." *Id.* at 20. The Company had no different release info at that point.

Plaintiff, himself, attributed Watson's e-mail query to the end of a vacation that Jones scheduled pre-injury. *See* DE 69-2 at 4 (Jones Dep. at 98).

Finally, the Court notes that as of January 5, 2017, Jennifer Liebler (who ultimately initiated Progressive's investigation) "suggest[ed] that [Progressive] accommodate the light duty request as of now" and anticipated that if such work ran dry Progressive would "send him back out until he's released to full duty[.]" DE 60-9 at 27 (Jan. 5, 2017, Liebler e-mail). In short, the full record conclusively shows that a January 2 return was not a condition of Jones's employment. Three days later, Progressive was contemplating a light-duty accommodation and, indeed, directed Jones to return on light duty more than a week after his January 2 absence.

However, contrary to Progressive's reading, Jones's testimony (along with Progressive's overtures) is hardly unequivocal as to a January 11, 2017, voluntary return. Jones stated that he would have returned if Progressive "told" him to come back and would have done whatever Progressive "told [him] to do[.]" DE 60-2 at 18 (Dep. at 117). Given workplace power dynamics, a manager's unvarnished directive carries inherent coercive import.[11] Logically, an employee receiving a superior's directions faces, at least, implied consequences (up to and including termination) for failure to comply. In other words, despite Progressive's portrayal, Jones did not concede that his return was voluntary. Indeed, Jones explicitly claimed Progressive **forced** him "to come back to work[.]" DE 60-2 at 29 (Dep. at 180).

---

[11] Coercion involves compulsion "by force, intimidation, or authority," especially "without regard for individual desire or volition[.]" *Coerce*, *Webster's Unabridged Dictionary* (2001 ed.). It includes "control, [ ] by exploiting fear, anxiety, etc." *Id.*

Jones's testimony does not stand alone. Progressive employees repeatedly cast Jones's return as a flat *expectation* and never presented continued leave as an option. *See, e.g.*, DE 60-9 (Liebler Declaration at 4 "he is supposed to return to work"); *id.* at 31 (Kemp 1/5/17 email—"When I spoke with [Jones] today I told him that . . . if we can accommodate we would expect you back to work immediately."); *id.* at 33 (Kemp 1/5/17 email to Jones—"We are able to accommodate your restrictions . . . [and] will expect your return to work to your normal hours tomorrow at your local office."). In truth, it seems that FMLA coverage and related strictures were not on the Progressive team's radar in coordinating Jones's return. *See, e.g.*, *id.* at 23 (Liebler 1/5/17 email to Kemp— "[e]verything we have in hand indicates that [Jones] was supposed to be back to work on 1/2/17"). [The dearth of FMLA references in the investigative file is confirming. *See generally id.*] Rather, (and as Defendant contends) Liebler, Kemp, and Watson "expected" Jones to follow his doctor's restrictions, "returning to work when the provider certified that he could do so, consistent with workers' compensation laws." DE 61-1 at 20; DE 60-9 at 39 (Liebler 1/6/17 email—"I spoke to Kenton briefly this morning. I informed him that the business can accommodate . . . and he is expected to return to work."); DE 64-20 at 6:30 (Liebler on 1/17/17 call—"you actually left after I informed you of the **requirement** to return to light duty" (emphasis added)). The problem (for Progressive) is, an employee that "no longer qualif[ies] for payments from [ ] workers' compensation" remains "**entitled** to continue on unpaid FMLA leave[.]" 29 C.F.R. § 825.702(d)(2) (emphasis added). Likely because of the workers' comp focus, Progressive never advised Jones of this entitlement or phrased return as a no-strings option. *See, e.g.*, DE 60-9 at 7 (Liebler notes from 1/11/17 call: describing Jones's leave as "time off work

recently related to his worker's [sic] comp incident from 12/19"). From the tenor of the various communications a jury could (reasonably) conclude that Progressive, relying on workers' comp standards, forced Jones to return, despite conflicting FMLA counter-options.

Further, as the Court views this discrete aspect of the claim, Progressive offers no "legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Grace*, 521 F.3d at 670. Again, Progressive "expected Mr. Jones to" return "to work . . . consistent with workers' compensation law." *See* DE 61-1 at 20. The applicable regulations bar setting such an "expectation" (carrying inherent employer-authority freight) wholly based on workers' comp status. In other words, the FMLA scheme anticipated (and forbade) Progressive's reliance on the proffered rationale. Thus, the Court finds that the "reason" Progressive offers for this particular conduct is not "legitimate[.]" *Grace*, 521 F.3d at 670; *see also Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

Jones, as to his return to work, offered sufficient proof to reach a jury as to each interference claim element. Specifically, a juror could reasonably conclude, based on this record, that Progressive coerced (mandated) Jones's return to a light-duty role. Certainly, there is no proof Progressive extended an option. Per Liebler "I wanted to ensure he understood that we would expect him back to work on [1/11]." DE 60-9 at 7. Under *McDonnell Douglas*, Progressive's failure to offer a legitimate, non-FMLA explanation means that Jones had no burden to show pretext; with no step three trigger, the Court's

analysis ends here. *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 448 (6th Cir. 2012). Jones made out a prima facie case, had no rebuttal obligation, and is entitled to a trial on the distinct forcible-return aspect of his interference claim.

## 2.  Retaliation

Initially, Plaintiff's allegations supporting his retaliation and interference theories were, excepting his ultimate termination, coextensive. *See* DE 25 at ¶¶ 24, 28. However, Jones, in Response, abandons all but Progressive's light-duty modifications to and termination from his job as predicates for the retaliation claim. *See* DE 64 at 20–21.[12]

### *Prima Facie Case*

Jones first claims that Watson's deposition testimony constitutes direct evidence of retaliation and that he thus needs no further proof to make out a valid claim. DE 64 at 20; *see also Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014)  ("If an employee successfully presents direct evidence that the employer acted with discriminatory motive, 'the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" (citation omitted)). The Court, for multiple reasons, disagrees.

---

[12] Plaintiff's claim trimming squares with prevailing authority on the degree of adversity necessary for retaliation claims. *See, e.g.*, *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 321 (6th Cir. 2013) ("In addition to terminations and pay reductions, demotions and negative changes in job responsibilities generally are sufficient to create a genuine issue of material fact as to whether the plaintiff suffered an adverse employment action."); *Dendinger*, 207 F. App'x at 527 ("We have repeatedly held . . . that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action."). In any event, Plaintiff, facing a well-supported dispositive motion, offers no argument or proof to show that "a reasonable employee would have found" any other Progressive conduct "materially adverse." *Crawford*, 531 F. App'x at 627. Thus, the Court dismisses any retaliation claims premised on Progressive conduct other than Jones's light-duty restrictions and ultimate termination.

First, true direct retaliation evidence is a narrow set:

> "Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." [*Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011)]. It is "'evidence from the lips of the defendant proclaiming his or her . . . animus.'" *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 526 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)).

*Hannon v. Louisiana-Pac. Corp.*, No. 3:17-CV-00922, 2018 WL 6102940, at *4 (M.D. Tenn. Nov. 21, 2018); *see Demyanovich*, 747 F.3d at 432 ("Direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of FMLA leave, but also that the employer acted on that predisposition." (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). Second, as previously discussed, Watson's isolated statement, even under a Jones-favorable light, presents, at best, a bare scintilla of evidence that Jones lost his job for missing work on January 2, 2017. *See also* DE 64-16 at 5 (Watson Dep. at 25: "I'm not going to be able to recall specific dates."). Third, contrary to Plaintiff's argument, Watson *never* said that Jones was fired "for his use of FMLA[.]" DE 64 at 20. Fourth, as Plaintiff himself argues, Watson's deposition revealed, if anything, a disregard for or disinterest in Jones's FMLA leave—this is obviously (and logically) inconsistent with FMLA discrimination. *See* DE 64 at 22 ("Watson . . . knew that Mr. Jones was on FMLA, but did not care as to how that entitlement affected his decision to terminate Mr. Jones."). In short, Jones's direct evidence theory has no merit. *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (The summary judgment standard "does not allow, much

less require, that we draw strained and unreasonable inferences in favor of the nonmovant." (quoting *Willis v. Roche Biomedical Laboratories, Inc.*, 21 F.3d 1368, 1380 (5th Cir. 1994)).

Turning to the circumstantial theory, Progressive does not dispute that Jones "engaged in an activity protected by the Act" or, at least as to the termination, that it "took an adverse employment action" against Jones.[13] *Hodnett*, 749 F. App'x at 394. Certainly, Jones applied for leave. *See* DE 64-9 at 6 (Certification of Serious Condition). He did not recall this act, but the document exists. Indeed, Progressive processed it and approved leave through the end of January 2017. *See* DE 64-1 (Designation Notice). Thus, Jones invoked anti-retaliation protection by invoking the Act.

Rather, Defendant disputes whether Plaintiff has shown a nexus "between the protected activity" and either predicate act. *Id.* Progressive modified Jones's duties the day he returned from FMLA leave and fired him less than a week later. "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). For present purposes, Progressive's challenged conduct came soon enough after Jones's leave to satisfy Plaintiff's causation burden. *Tinsley v. Caterpillar Fin. Servs., Corp.*, No. 18-5303, 2019 WL 1302189, at *6 (6th Cir. Mar. 20, 2019) ("[I]f the adverse employment action closely follows the protected activity, then temporal proximity alone is sufficient to satisfy the

---

[13] Progressive does contend that its modification of Jones's job duties was insufficiently adverse. The Court sees a genuine factual dispute on this issue. *Grace*, 521 F.3d at 677 ("Notably, 'a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.'" (citation omitted)). A jury could reasonably find that the modified conditions, particularly the Progressive-mandated check-in/check-out procedure and rigid micromanagement, for an employee used to freedom in the field, were sufficiently adverse to discourage a reasonable employee from taking future leave.

causation prong[.]"); *see also Grace*, 521 F.3d at 677 (barring consideration of employer's rationale for prima facie purposes). Thus, Progressive needed to offer a legitimate, non-FMLA, explanation for its conduct.

*Pretext & Honest Belief*

As to Jones's modified responsibilities, Progressive asserts that it merely crafted a light-duty role for Plaintiff consistent with his doctor's orders. As to termination, Progressive contends that it fired Jones after a thorough investigation revealed that he lied in violation of core Company principles. The record amply and one-sidedly supports both contentions.

Jones's Baptist Health records, as of January 4, 2017, authorized an immediate return to work with the following restrictions: "No lifting[, pushing, or pulling] greater than 10 pounds" and "[n]o work above shoulder / chest level" with Jones's left arm. DE 60-13 at 2. Watson's communicated "Light Duty Assignment Requirements" were entirely (and undisputedly) consistent with Jones's doctor's orders. *See* DE 64-15 at 1 (Jan. 11, 2017, Watson e-mail to Jones: establishing 11, desk work only, requirements). As to termination, Watson repeatedly testified that Progressive terminated Jones for violating Progressive's core integrity principle through dishonesty related to his return to work. *See, e.g.*, DE 69-1 at 3–4, 9 (Dep. at 21, 24, 49); DE 64-16 at 4 (Dep. at 53). Liebler's deposition (and the full record) confirms. DE 69-3 at 4 (Dep. at 109); *see, e.g.*, DE 64-20 at 16:20. Jones's alleged deception began with the initial medical status, continued in characterizations of his release terms, and extended to gamesmanship and nondisclosure with respect to his location, travel, and availability for work from January

4 to January 10. Progressive's investigation, and the January 11 and January 17 calls, detail the Company's concerns about probity.

These reasons, "if believed by [a jury], would support a finding that unlawful [retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2747 (1993). Put simply, Progressive carried its "extremely light" *McDonnell Douglas* step two production burden. *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*, 204 F. App'x 528, 536 (6th Cir. 2006); *cf. Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) ("It is important to note that the defendant need not *prove* a nondiscriminatory reason for [an adverse employment action], but need merely *articulate* a valid rationale." (emphasis in original)).

Thus, the retaliation claim's survival comes down to whether Jones "produced adequate evidence demonstrating that [Progressive's] proffered reason[s] were a pretext for discrimination." *Seeger*, 681 F.3d at 285. Jones needed to show "*both* that the reason was false, *and* that [retaliation] was the real reason." *St. Mary's Honor Ctr.*, 113 S. Ct. at 2752 (emphasis in original). Plaintiff's options include showing that Progressive's explanations "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285.

> Jones, though failing to specify, appears to pursue the first path—which is
>
> essentially an attack on the credibility of the employer's proffered reason and consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual. Where the employer can demonstrate an honest belief in its proffered reason, however, the inference of pretext is not warranted. Thus, th[e] Circuit has adopted the "honest belief rule." Under this rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the

employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir. 2006)). Jones's pretext theory has two pillars. Plaintiff claims: (1) that there is a genuine dispute as to whether he ever lied and (2) that Watson confirmed that Progressive fired Jones, not because he was dishonest, but for his January 2, 2017, absence.

Initially, the Court notes that none of Jones's pretext arguments addresses Progressive's explanation for modifying his job duties. Thus, to the extent Jones bases his retaliation claim on such conduct, the theory does not approach nor clear the *McDonnell Douglas* step three hurdle. As to Jones's dishonesty, the Court—though much of the honestly held belief proof strongly demonstrates otherwise—will assume for argument's sake that Jones creates a triable issue as to whether he actually lied. Nonetheless, "[a]s long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger*, 681 F.3d at 285–86 (citation and quotation marks omitted). Plaintiff wholly failed to show that (or create a triable issue on whether) Progressive did not honestly believe that Jones was dishonest.

Progressive thoroughly investigated.[14] By January 5, 2017, Jones's reported statement to Travelers that "the business could not accommodate light duty restrictions"

_____

[14] Jones disputes many of the statements attributed to him. However, for purposes of the honest belief analysis, the "determinative question is not whether [Jones] actually [lied], but whether [Progressive] reasonably and honestly believed that he did." *Seeger*, 681 F.3d at 286. Jones does not dispute the authenticity of Progressive's documented communications regarding its investigation. Thus, the Court, for present purposes, summarizes the relevant investigatory file without regard to Jones's "argument and

aroused suspicion in Progressive's HR Department. *See* DE 60-9 at 31–32 (Jan. 5, 2017, Liebler e-mail). Consequently, Liebler "thought it would be wise" to get the various involved parties "on the same page" concerning Jones's status. *See id.* (sent or copied to Jacqueline Jerome, Sharon Kemp, Linda Nelson, John Watson, and Christopher Leissner). The next day, Liebler advised Jones that the business could accommodate his restrictions and asked why he had advised Travelers otherwise. *Id.* at 39 (Jan. 6, 2017, Liebler e-mail). Jones denied the statement. *Id.* Following the conversation, Liebler further reported that Jones "decided to travel to AZ under the assumption that he would be off work because of the restriction; he has a flight scheduled to return home on Tuesday." *Id.* Liebler also began collecting information regarding Jones's communications and conduct while on leave. *See id.* Based on perceived discrepancies in Jones's explanation, Liebler initiated a formal inquiry into "a concern of deceptive work avoidance and potentially an integrity concern[.]" *Id.* at 5.

On January 11, 2017, Liebler, Watson, and Leissner interviewed Jones regarding several apparent inconsistencies. DE 60-9 at 7. Specifically, and given the December 28, 2016, authorization for an immediate (though limited) return to work, Liebler asked Jones about his failure to return to work after his pre-scheduled vacation ended on January 2, 2017. *Id.* Jones stated that he did not have the authorizing paperwork. *Id.* Liebler asked about Jones's January 2 e-mail to Watson claiming that "they have taken me off work longer than expected[.]" *Id.* at 8 (Interview) & 20 (e-mail). Jones stated that he believed

---

presentation of competing facts[.]" *See id.* (In the honest belief context, such disputes are "misdirected" if, as here, they do not "question [the employer's] investigatory process."). For ease of reading and though recognizing disputes as to certain statements, the Court omits qualifiers—*e.g.*, allegedly or purportedly—in describing Liebler's account.

the doctor's office would have communicated with Progressive and that the doctor told him "you can't do that" when Jones described his typical work responsibilities. *Id.* at 8.

As to the Arizona trip, Jones said he purchased his tickets on January 5, but could not recall whether he purchased them in the morning or afternoon. *Id.* Jones stated that he flew to Arizona that same night and reported returning Tuesday night. *Id.* at 9. Though acknowledging that Kemp advised him of *possible* light duty prior to his departure, Jones explained that he chose to proceed with his travel plans because Progressive did not *confirm* light-duty availability until his January 6 conversation with Liebler. *Id.* at 8–9

In the following days, Progressive obtained and reviewed Jones's flight documents. *See id.* at 52 (Jan. 16, 2017, Liebler e-mail to Jones). The records revealed the following information: Jones booked his ticket on January 4, 2017, *id.* at 53, and Jones's flight left for Arizona on the afternoon of January 6, *id.* at 55. Liebler, Watson, and Leissner interviewed Jones again on January 17. *Id.* at 9. Jones surreptitiously recorded this call. *See* DE 64-20 (Recording).

First, Liebler inquired about the discrepancy between Jones's prior reported January 5 purchase and the actual January 4 booking dates. *Id.* at 00:42. Jones denied ever claiming a January 5 purchase. *Id.* Leissner or Watson (the call is not clear which) corroborated Liebler's notes regarding the January 5 representation. *Id.* at 01:15.[15]

_____

[15] The Court notes additional support from the fact that a discussion as to whether the ticket was purchased in the morning or afternoon occurred in the first place. [Liebler reported this discussion not only in her investigation notes (backed by at least one other set), DE 60-9 at 4, but also on the call *before* Jones disclaimed a January 5 purchase representation. *See* DE 64-20 at 00:45.] Such inquiry would have been irrelevant unless Jones had claimed a January 5 booking. That is, that subject was discussed in the context of purchase timing relative to the January 5 Kemp call regarding possible light duty. If Jones had reported that he did not know when he bought the tickets (as he claimed on January 17) or reported a January 4 purchase, it would have made little sense for

Assuming a January 4 purchase, Liebler asked why Jones did not report the pending travel to Kemp when she identified a potential light-duty return. *Id.* at 03:45. Jones claimed he did not credit the information because "any other time that there was any kind of restriction we wouldn't return to work until we [were] cleared." *Id.* at 04:10.[16]

Next, Liebler questioned the variance between Jones's prior January 5 departure report and the records' indication of a January 6 flight. *Id.* at 05:00. Liebler also asked why Jones would have told her, at 11:30 a.m. on January 6 that he was in Arizona, when his flight did not actually leave until roughly four hours later. *Id.* Jones claimed he previously said he was "*on his way* to," not *in* Arizona and that he *left* January 5, not that he *flew out* on January 5. *Id.* at 05:35. When pressed, Jones explained that, on January 5, he drove to Cincinnati to stay with his cousin in anticipation of the next-day flight. *Id.* at 06:30.[17] Jones hedged that he may have confused the dates because he was "caught off

---

Progressive to try pinning down the exact purchase time vis-à-vis the January 5 Kemp call.

[16] Jones's HR records, at minimum, strongly imply that Jones's claim as to prior non-accommodation is false. *See* DE 60-8 at 3 (June 9, 2009, after a prior FMLA leave, Jones reporting: "I am at work and working with management on my restrictions.").

[17] This tale is particularly shaky for multiple reasons. First, Jones, on January 17, stated that he drove to his cousin's house on January 5. Jones also conceded that his flight to Arizona did not leave until roughly four hours after his January 6 call with Liebler. DE 64-20 at 09:30. Thus, Jones's own words strongly refute any claim that he was "on his way" **anywhere** when he spoke with Liebler on January 6. [Liebler's January 6 e-mail memorializing the morning conversation also indicates that Jones claimed he was in Arizona when they spoke. *See* DE 60-9 at 39.] Second, Jones does not dispute that Liebler advised him that Progressive would expect him back on January 9, or that Liebler adjusted this date to January 11 based on Jones's representation that he would be back on January 10. In case context, the structure of this conversation only makes sense if Jones told Liebler he was already in Arizona. Surely if Jones had merely said he was "on his way" to Arizona, Liebler would have inquired if he could cancel his travel plans or, at least, noted Jones's decision to board a flight with notice that Progressive expected him back before his planned return. [Since Liebler initiated the contact, the Court can rule out the possibility of an in-flight call.] Remember also: Jones reported that the only reason he forged ahead with his Arizona plans following the January 5 Kemp conversation was

guard." *Id.* at 7:40. [Of course, as either Watson or Leissner pointed out, Liebler's questions to Jones on January 6 were not about any long-past events, but about his current, or very recent, acts. *Id.* at 8:00.] Importantly, on the January 17 call that only Jones knew he was taping, Jones did not unequivocally deny claiming he had been in Arizona during the Liebler 1/6 contact. He said he did not know if he had claimed to be in or on the way to Arizona during the discussion. Further, he did not deny withholding from Kemp the fact of the planned travel—Jones already held non-refundable tickets and yet said nary a word to Kemp about the trip. Progressive has good reason for feeling misled and misused by Jones's opaqueness during these interactions. It is not forthright to discuss a January 6 return to work without revealing a plan to be in The Grand Canyon State on the proposed return day.

Progressive's investigation, as recited, provided many self-evident bases for a reasonable good-faith belief in Jones's dishonesty. The Court has noted others. Progressive's documenting of Jones's shifting narrative—from the first interview to the second—was alone sufficient for Progressive to carry its burden here. Certainly, Jones disputes whether he actually changed his story. Yet, for present purposes, such a dispute is (in this case)[18] irrelevant. *See Seeger*, 681 F.3d at 286 (The "determinative question is not whether [Jones] actually [lied], but whether [Progressive] reasonably and honestly believed that he did."). As Jones himself conceded, with three Progressive employees believing he lied, the Company was hardly unreasonable in acting on their word over his.

---

because the availability of light-duty was still an open question; and, on January 6, Liebler explicitly (and undisputedly) informed Jones that light-duty was available *before* he got on his flight to Arizona. DE 64-20 at 09:50.

[18] This is not a case where the factual truth of the employer's termination grounds is so dubious that any reliance on such grounds, itself, casts doubt on the investigation's validity or the honesty of the employer's belief.

*See* DE 60-2 at 25 (Dep. at 172: "Q. . . . But you understand from an investigative standpoint when you have three people who believe they heard dishonesty and one person who says, absolutely didn't happen . . . it doesn't have to be, but three often beats one? A. It does. It does.").

In sum, Progressive's investigation unearthed reasonable grounds for its demonstrated honest belief in Jones's suspected mendacity.[19] Progressive's Code of Business Conduct and Ethics lists "Integrity" as its first core value, and states: "We revere honesty." DE 60-5 at 3. Progressive policies provide for "Termination" as discipline for "[m]isconduct such as dishonesty, or conduct which violates . . . the Code of Business Conduct and Ethics." DE 60-7 at 4. From the moment that Progressive terminated Jones, *see* DE 64-20 at 16:20, to date, Defendant has consistently maintained that it fired Jones because the Company believed he was dishonest during the episode at issue. The record amply substantiates this belief. Stated otherwise, Progressive "reasonably relied on the particularized facts that were before it at the time" it terminated Jones. *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012).

Jones thus had an opportunity to rebut Progressive's showing of honest reliance on a specific record. *Smith*, 155 F.3d at 807 ("[O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to

---

[19] The Court also notes some bolstering effect for Progressive's belief arising out of Jones's isolation (or, at best, spotty availability) during his leave. The record includes numerous reports of unanswered calls, and many that Jones claimed he did not receive. *See, e.g.*, DE 64-20 at 02:50; DE 60-9 at 43 (Jan. 11, 2017, Tracy Harrigan e-mail). Further, Jones claimed, throughout, an inability to set up his voicemail. *See* DE 60-9 at 7. Though not direct dishonesty proof, being unreachable during a period immediately preceding a planned vacation while relying on an unknown work status (as reflected by the January 5 Kemp call) smacks of evasion. Jones knew Kemp was trying to clear him for a January 6 return, yet Kemp could not raise Jones again on that date.

produce 'proof to the contrary.'" (citation omitted)). To this end, Jones cites *Smith*'s requirement that the employer's belief not be based on "ignorance and mythology[.]" *See* DE 64 at 22.[20] However, Plaintiff misperceives the thrust of this side rule. Reliance on ignorance or mythology is simply the logical counterpoint to a decision grounded in particularized facts. To avoid retaliation liability, employers are not required to, as Jones evidently believes, incorporate a thorough contemplation of the FMLA into a decision honestly made on a wholly separate basis. *Cf. Mullendore*, 872 F.3d at 329 ("The problem with Mullendore's theory of her case is that it equates a termination in her absence with a termination because she was absent on FMLA-qualifying medical leave. The former is permissible, even when an employee is on medical leave; the latter is not permissible."). Progressive showed that it honestly believed—based on a fulsome investigation and specific facts—and relied on a *non*-FMLA basis in discharging Jones. That is all *Smith* requires.[21]

---

[20] To the extent Jones relies on Watson's deposition as honest-belief rebuttal proof, consistent with a case theme, Jones's interpretation of the relevant statements stretches well past the region of reasonable plaintiff-favorable inferences. Watson's testimony does not contradict the Company line. Progressive claims it terminated Jones because he lied, not because he went to Arizona. At bottom, nothing about Watson's deposition provides reasonable grounds to question whether Progressive "made a reasonably informed and considered decision" before firing Jones. *Smith*, 155 F.3d at 806 (describing this issue as "the key inquiry").

[21] "[T]he focus of a discrimination suit is on the intent of the employer." *Smith*, 155 F.3d at 806. Plaintiff's claim that Progressive decided to terminate Jones in "ignorance" of his FMLA status actually works to defeat the underlying claim rather than the honest belief defense. DE 64 at 22. Contrary to Jones's theory, Progressive **can** ignore the FMLA and "claim an honest belief that their actions were consistent with that same framework." *Id*. Indeed, the FMLA discrimination prohibition effectively promotes the type of process that Jones castigates Watson for utilizing: "Mr. Watson . . . knew that Mr. Jones was on FMLA, but did not care as to how that entitlement affected his decision to terminate Mr. Jones." *Id.*; *see Hodnett*, 749 F. App'x at 393–94 (A "prima facie case of retaliation" requires a plaintiff to show "that there was a causal connection between the [FMLA] protected activity and the adverse employment action."). Indeed, if Progressive had

Finally, and most importantly, Jones failed to carry his ultimate burden. Plaintiff needed to produce "sufficient evidence from which the jury could . . . infer that [Progressive] intentionally discriminated against him." *Seeger*, 681 F.3d at 285. "Here, . . . much of the evidence most damaging to [Jones]'s allegations comes from h[is] own testimony." *Hartsel*, 87 F.3d at 800. Plaintiff, at deposition, declined to attribute any of Progressive's conduct to his FMLA leave. *See* DE 60-2 at 22–23 (Dep. at 161–62). Rather, Jones claimed Progressive's actual motives stemmed from disharmonious events and grudges formed years before his 2016 injury. *Id.* Progressive's past grants of Jones's FMLA leave requests (with no allegation of adverse consequences) further undercut any purported leave-termination linkage. *See* DE 60-8 (Jones HR Records). Put simply, Jones, himself, evidently does not believe that Progressive fired him as punishment for taking FMLA leave, and the record reveals no proof suggesting otherwise.

### 3. FMLA Sub-Conclusion

Taken as a whole, the record shows that Progressive made a mistake in handling Jones's leave: Company officials did not consider Jones's FMLA status in their decision-making. On the one hand, Progressive's failure to adequately account for Jones's FMLA protections is the driving force for a triable interference claim; on the other, this same proof strongly refutes any claimed retaliatory animus. Progressive, for good, record-substantiated reasons, believed Jones lied and fired him as a result. For these reasons, and those previously discussed, Progressive is entitled to summary judgment on Jones's retaliation claim, but the interference claim, though abridged, survives.

---

discussed the FMLA during its investigation, Jones would surely be pointing to such communications as proof of retaliation.

The "difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the FMLA." Hon. Charles R. Richey, 1 *Manual on Employment Discrimination* § 9:41.10 (2019). Progressive ignored the role of the FMLA in this drama. It may thus have interfered, but its ignorance shows no anti-FMLA animus leading to Jones's discharge. That, he alone caused.

### B. KRS 342.197 Workers' Comp Retaliation – Count IX

Plaintiff's state workers' compensation retaliation[22] claim fails for essentially the same reasons that the FMLA iteration failed. The claim elements are virtually identical:

> A prima facie case of workers' compensation retaliation under Kentucky law requires evidence that "(1) the plaintiff engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action."

*Saunders v. Ford Motor Co.*, 879 F.3d 742, 752 (6th Cir. 2018) (quoting *Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 152 (Ky. Ct. App. 2009)). Kentucky applies *McDonnell Douglas* burden shifting to workers' comp retaliation claims. *See Kentucky Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003). The Court, for the reasons discussed in the FMLA context (*i.e.*, material disputes as to the adversity of changed duties and, given temporal proximity, the requisite causal connection), finds that Jones provided sufficient proof to overcome the *prima facie* hurdle. *See, e.g.*, *id.* at 135 ("[C]lose temporal proximity alone may be sufficient" proof of a nexus between protected and adverse acts.).

---

[22] KRS 342.197(3) provides a cause of action for violation of the following anti-retaliation provision: "No employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under this chapter." KRS 342.197(1).

However, on the analysis tracking FMLA retaliation, Jones failed to rebut Progressive's substantiated honest belief in his deception or provide any proof of discriminatory animus. This dooms the state law claim. Progressive eagerly sought Jones's return to work; he offers no proof that the discharge flowed from a retaliatory source.

### C.  IIED & NIED – Counts III & IV

Plaintiff's IIED and NIED claims also fail as a matter of law. Kentucky IIED has four elements:

> [1] the wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress[;] and [4] the distress suffered must be severe.

*Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000). The tort is only "intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Id*. at 914. A Kentucky NIED claim first requires proof "of the recognized elements of a common law negligence claim[.]" *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) ("*Keeney*"). That is, a plaintiff must show "that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). However, when the alleged injury is purely emotional distress, the IIED severity requirement applies. Thus, for both IIED and NIED claims "[d]istress that does not significantly affect the [plaintiff's] everyday life or require significant treatment will not suffice. And a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Keeney*, 399

S.W.3d 17–18; *see also MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (*Keeney*'s expert testimony requirement applies to NIED & IIED.).

Plaintiff presents no affirmative evidence "concerning any severe emotional distress[.]" *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 545 (Ky. Ct. App. 2013). This "failure [is] fatal to" Jones's NIED and IIED claims. *Id.* The lack of distress severity proof is not the only deficiency in these two claims[23] but, for present purposes, it suffices to justify summary judgment on Counts III and IV.

### D. Negligence / Vicarious Liability – Count V

Jones evidently accepts Progressive's premise (mostly borne out by the Complaint language, *see* DE 25 at ¶¶ 34–37) that Count V does not include a common law negligence claim.[24] Rather, as Defendant attacks it (and Plaintiff defends it), Count V presents a freestanding vicarious liability claim. *See* DE 61-1 at 28; DE 64 at 25. Yet, the

---

[23] For instance, courts in this District have previously held that "mere termination of employment and the resulting embarrassment do not rise to the level of outrageous conduct and resulting severe emotional distress necessary to support a claim for IIED." *Stevens v. Saint Elizabeth Med Ctr. Inc.*, No. 2:10-20-DCR, 2012 WL 298307, at *5 (E.D. Ky. Feb. 1, 2012) (quoting *Miracle v. Bell Cnty. Emergency Med. Servs.*, 237 S.W.3d 555, 560 (Ky. Ct. App. 2007)). As to the negligence claim, Jones does not specifically identify any duty that Progressive owed him and allegedly breached to cause him emotional distress. The Court, here, merely identifies example deficiencies but sees no need to exhaustively catalogue these claims' several flaws.

[24] Further, even if Plaintiff were asserting a common law negligence theory based on the alleged FMLA violations, the claim would likely be preempted. *See Kastor v. Cash Exp. of Tennessee, LLC*, 77 F. Supp. 3d 605, 614 (W.D. Ky. 2015) ("In a thorough and oft-cited opinion, Judge Gibson in the Western District of Pennsylvania compiled nearly 20 cases finding 'that the FMLA provides the exclusive means of recovery for violation of rights created by the FMLA' before dismissing the plaintiff's section 1983 claim that would have allowed emotional distress or punitive damages. *Hayduk v. City of Johnstown*, 580 F.Supp.2d 429, 480–87 (W.D. Pa. 2008)."). This same preemption rationale confirms the Court's dismissal of Jones's IIED and NIED claims. *See id.* at 614–15 ("If a plaintiff could bring an IIED claim based on conduct that was made unlawful by the FMLA, she could circumvent th[e] exclusive remedial system that Congress created for FMLA violations.").

doctrine of "*respondeat superior* is not a cause of action. It is a basis for holding [defendant] responsible for the acts of its agents." *O'Bryan v. Holy See*, 556 F.3d 361, 370 n.1, 383 (6th Cir. 2009). Thus, Count V states no valid cause of action and the Court dismisses the claim.[25]

### E. Contract, Conversion, and Statutory Wage Claim – Counts VI–VIII

In relevant part, KRS 337.385 provides:

> [A]ny employer who pays any employee less than wages and overtime compensation to which such employee is entitled under or by virtue of KRS 337.020 to 337.285 shall be liable to such employee affected for the full amount of such wages and overtime compensation, less any amount actually paid to such employee by the employer, for an additional equal amount as liquidated damages, and for costs and such reasonable attorney's fees as may be allowed by the court.

In turn, KRS 337.055 requires prompt payment of "all wages or salary earned" following termination. Kentucky "wages" include "vested vacation pay[.]" KRS 337.010. However, "[v]acation pay is purely a matter of contract between employer and employee." *Berrier v. Bizer*, 57 S.W.3d 271, 281 (Ky. 2001).[26] Jones's wage claim, then, turns on whether he received all vacation pay "vested" on Progressive's policy terms.

Progressive's "Leave Specialist" Kemp, by sworn declaration, states that, based on Defendant's records and consistent with Defendant's Earned Time Benefit ("ETB") policy, Jones was paid all "earned and accrued time off." DE 60-24 (Kemp Declaration). Specifically, Kemp avers that Progressive paid Jones $13,570.14 for 366.57 earned

---

[25] Further, Progressive admits that it would be liable for its employees' acts if Jones is successful on any claims. DE 61-1 at 28. The upshot is that to the extent a vicarious liability theory is necessary for any of Jones's claims to survive summary judgment, Progressive has conceded the point. Accordingly, the Court sees no need for separate treatment of the theory in conjunction with any other claims.

[26] *See id.* ("No Kentucky statute requires an employer to compensate an employee for accumulated vacation time. OAG 91–73. Nor is there an inherent right either to a vacation or to payment for unused vacation time.").

vacation hours. *Id.* at ¶ 4. Based on Kemp's statement, Progressive seeks summary judgment on Count VIII. DE 61-1 at 33.

Jones claims that his deposition testimony precludes summary judgment on this issue. DE 64 at 32. The most Jones-favorable reading salvageable from the relevant transcript segment is a halting contention that Jones believes Progressive owes him "60 or 70 hours" of vacation time. DE 64-17 at 4 (Dep. at 186–87). For several reasons and on the full record, the Court sees no triable issue as to the wage claim.

First, Jones (as the Court reads the transcript) does not claim that Progressive *improperly* deducted vacation time. *See* DE 64-17 at 4 (Dep. at 187: "[O]ut of my vacation time of 400 plus hours they took out so many hours. What for, I don't know."); *id.* (Dep. at 188: Jones, when asked what compensation he felt he was owed, stated that he wanted to "figure out . . . what" the basis was for the reductions). Such ambiguity in the foundational evidentiary predicate places the claim on a dicey perch.

Second, though Jones's briefing more firmly claims improper reductions, he fails to explain *why* he believed that Progressive owed him accrued vacation wages for 60, 70, or any number of hours.[27] For instance, if Jones is saying that Progressive incorrectly calculated his "vested" hours,[28] he does not provide or identify the governing policy provisions, much less point to any specific deviation. Alternatively, if his theory is that the ETB hours were correctly tabulated but payment was maliciously withheld, he points

_____

[27] Jones appears to disclaim any reliance on the 11 "dock" hours Kemp addressed in her declaration. *See* DE 64 at 33 n.49. Jones's payment records square with Kemp's representations as to the 11-hour figure. *See* DE 55-3 at 7. Thus, even if the "dock" protocol was the basis for Jones's wage claim, the gulf between the 11 recorded "dock" hours and Jones's 60-70 hour estimate would, if anything, undercut the only record proof Plaintiff relies on: his own deposition.

[28] Or, perhaps, divested his hours in contravention of Company policy.

to no record support. [Plaintiff's failure, in this procedural step, to advance a calculation contrary to Kemp's report—*e.g.*, claiming an alternative number of hours owed or actually paid—is glaring.]

Finally, the Court notes that Plaintiff (during discovery) disclosed and Defendant (with a prior motion) filed documentation regarding Jones's ETB accrual during the relevant period. DE 55-3 (Jones e-mailed Pay Statements).[29] The papers record payments before Jones's injury (December 8, 2018) and continue until after his termination (January 19, 2017). *Id.* at 1, 5. Jones's paystubs reveal two relevant facts: (A) the maximum reported ETB balance during this period was 369.68 hours, *see id.* at 3–4 (Dec. 22, 2019); and (B) the final, January 19, ETB balance was 366.57 hours. The former contradicts Plaintiff's recollection of an ETB balance of "400 plus hours[.]"[30] DE 64-17 at 4 (Dep. at 187).[31] The latter precisely tracks Kemp's sworn narrative. *See* DE 60-24 at 2 ("Jones received a gross (pre-deduction) payment of $13,570.14 representing 366.57 earned and accrued ETB hours[.]").[32]

---

[29] Confusingly, neither party's briefing confronts these on-point records. Perhaps the parties misinterpreted Judge Ingram's ruling on the marital communications privilege. *See* DE 58 (Order). Yet, the DE 58 finding clearly addressed "messages . . . not before the Court[.]" *Id.* at 9. The DE 55-3 emails were not in that category. Rather, as Judge Ingram aptly stated: "A waiver of the privilege requires an intentional disclosure of the content of the confidential communication by the party seeking to invoke the privilege." *Id.* at 8 (citations and quotation marks omitted). The privilege, as to the pay statement emails, was fully waived.

[30] Jones's belief that Progressive's reduction from his "400 plus hours" occurred "near [his] termination" strengthens the contradictory impact of the pay records from this specific period. *See* DE 64-17 (Jones Dep. at 187).

[31] Further, the Court notes that the difference between Jones's estimation of his pre-termination ETB balance and the objectively recorded balances roughly approximates the 60+ hours Jones believes Progressive shorted him.

[32] The dollar figure is also consistent with a 366.57-hour payment at Jones's pre-termination $37.019 hourly rate. *See, e.g.*, DE 55-3 at 3.

Jones's own pay records corroborate Kemp's claim that Progressive followed its vacation-time policies, including full post-termination compensation for any ETB balance. As stated, the Court questions whether Plaintiff's equivocal deposition statements amount to a contrary allegation. Yet even if they do, when, as here, a movant provides a personnel department member's sworn declaration regarding employment records, a plaintiff's "conclusory allegations unsupported by specific evidence are insufficient to establish a genuine issue of material fact." *Hinson v. Tecumseh Prod. Co.*, 234 F.3d 1268 (table), 2000 WL 1597947 (6th Cir. 2000). Jones brings nothing more to bear. Accordingly, Defendant is entitled to summary judgment on the wage claim.

The same analysis dooms Jones's breach of contract[33] and conversion[34] claims. Plaintiff pegged both claims to Progressive's alleged failure to fully compensate him for accrued ETB. *See* DE 64 at 33; DE 25 at ¶¶ 38–41; *id.* at ¶¶ 42–48. Jones testified that he

---

[33] "To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville / Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). Jones never identifies, with any specificity, what provision of what contract he bases his claim on. The Court can hardly assess breach or damages without proof as to contract terms. Because Jones established no genuine dispute as to any claim element, Progressive is entitled to summary judgment on the contract theory.

[34] Kentucky conversion has 7 elements:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Jasper v. Blair*, 492 S.W.3d 579, 583 (Ky. App. 2016); *Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005). Plaintiff failed to show a triable issue as to any property of Jones Progressive improperly holds. Thus, the claim fails on multiple elements.

did not believe Progressive owed him anything else. DE 60-2 at 34 (Dep. at 188). Plaintiff failed to show any genuine dispute regarding a property or contractual right to any additional ETB compensation. Accordingly, the conversion and contract breach claims fail as a matter of law.

### F.  Interference with Contractual Relations – Count X

Jones's contractual interference claim is also deficient. "Kentucky law follows the Restatement (Second) of Torts for tortious interference claims." *Mountain Motorsports Paving & Const. LLC v. Yamaha Motor Corp., U.S.A.*, No. 14-CV-76-ART, 2014 WL 5341865, at *7 (E.D. Ky. Oct. 20, 2014) (citing *Carmichael–Lynch–Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977) (interference with existing contract rights)). The claim requires: "(1) the existence of a contract; (2) [Progressive]'s knowledge of this contract; (3) that [Progressive] intended to cause its breach; (4) its conduct caused the breach; (5) this breach resulted in damages to [Jones]; and (6) [Progressive] had no privilege or justification to excuse its conduct." *Rich & Rich P'ship v. Poetman Records USA, Inc.*, 714 F. Supp. 2d 657, 669 (E.D. Ky. 2010). Jones bases his claim on Progressive's alleged interference with workers' compensation and disability benefits. *See* DE 64 at 33.

Progressive seeks summary judgment based on Plaintiff's failure to produce or identify any breached contract. *See* DE 61-1 at 35.[35] Jones's half-paragraph response generally references "[f]acts adduced in discovery" in support of a conclusory assertion that Progressive improperly interfered "with Mr. Jones'[s] contractual rights to benefits." DE 64 at 33. This rudimentary argument cannot stave off summary judgment. *Gooden v.*

---

[35] Jones, through discovery, confirmed that his interference claim involved a written contract. *See* DE 60-22 at 9 (Pl.'s Interrog. Resps.).

*City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment."). Fatally, Plaintiff did not identify or file any specific contract. Without a contract to review, the Court cannot possibly assess breach. In short, Jones's interference claim lacks any record support for multiple essential elements, and Progressive is entitled to summary judgment.

### G. Wrongful Use of Administrative Proceedings – Count XI

Kentucky's wrongful use of administrative proceedings tort is a species of malicious prosecution. *See Martin v. O'Daniel*, 507 S.W.3d 1, 10 (Ky. 2016) (describing the Restatement (Second) of Torts § 674 "Wrongful Use of Civil Proceedings" as explaining "malicious prosecution claims arising out of civil litigation"). A successful plaintiff must prove that:

> 1) the defendant initiated, continued, or procured . . . an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the . . . civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
> 4) the proceeding . . . terminated in favor of the person against whom it was brought; and
> 5) the plaintiff suffered damages as a result of the proceeding.

*Id.* at 11–12. Probable cause "exists where the person who initiates civil proceedings 'reasonably believes in the existence of the facts upon which the claim is based, and . . . that under those facts the claim may be valid under the applicable law.'" *Prewitt v. Sexton*, 777 S.W.2d 891, 894 (Ky. 1989) (quoting Restatement § 675). The existence of probable cause is a legal "question for the *court*[.]" *Id.* (emphasis in original). Because

the tort is disfavored, a plaintiff must "strictly comply with the prerequisites of maintaining an action." *Id.* at 895 (citation omitted).

Plaintiff contends that Progressive's submissions to Kentucky's Division of Unemployment Insurance (the "Division") regarding its explanation for the Jones termination effectively "continued" the unemployment proceeding against him. *See* DE 64 at 29. The Court has serious doubts about this proposition. Generally, unemployment proceedings are a poor fit for the wrongful use of administrative proceedings rubric. The employee (not the employer) must, typically, initiate the process. *See* KRS 341.350 ("An unemployed worker shall . . . be eligible for benefits . . . only if: (1) He or she has made a claim for benefits."). *But see* 787 KAR 1:090 at § 4(1) ("An employer may file a claim on behalf of an unemployed worker if: (a) The worker has definite recall rights within four (4) calendar weeks[.]"). Further, an unemployment proceeding is not "an administrative disciplinary proceeding against the plaintiff[.]" *Martin*, 507 S.W.3d at 10. Rather, the proceedings concern benefits accruing or owed to a claimant. Finally, when an employee is fired "for a reason other than lack of work," state regulations **require** the employer to timely notify the Division "in writing[.]" 781 KAR 1:060 at § 2.

Case-specific reasons also undercut Jones's continuation claim. For instance, Progressive, itself, did not submit anything to the Division. A "Third Party Administrator" filed the at-issue report. *See* DE 60-17 at 1 (Unemployment Submission). [Jones offers no agency theory or proof to justify imputing the administrator's conduct to Progressive.] Jones (not Progressive) initiated the appeal and thus "continued" the proceedings. *See* DE 64-27 at 1 (Referee Decision). Progressive, though later appearing by counsel, presented no evidence. *See id.* at 2. In short, the Court sees no record proof

that Progressive "continued" any "disciplinary proceeding against" Jones. Given the tort's disfavored status and the Commonwealth's strict compliance requirement, the Court finds that these discrepancies, between case facts and claim elements, justify dismissal.[36]

Finally, even if Progressive had "continued" proceedings against Jones, the Court, for the reasons discussed in the retaliation analysis, finds that Defendant had probable cause to do so. That is, Progressive, based on specific facts and after a thorough investigation, "reasonably believed" that Jones lied and that such dishonesty provided

---

[36] In analogous circumstances, the Sixth Circuit opined:

> Plaintiffs' argument would stand the law of malicious prosecution on its head. By plaintiffs' reasoning, a successfully challenged wrongful dismissal from a job subject to a collective bargaining agreement, for example, would support not only the standard claims against the employer or union or both, but also a claim for malicious prosecution because the employee invoked internal administrative or judicial proceedings for reinstatement or compensation. Similarly, every successful defamation case would support a parallel cause of action for malicious prosecution because the plaintiff is also entitled to institute proceedings to redress injury to his reputation.
>
> Malicious prosecution relates to resort to procedure for abusive purposes. Where a plaintiff complains of other conduct, even conduct requiring the plaintiff to institute proceedings to reverse the effect of a defendant's conduct, the plaintiff must assert a cause of action premised directly on the underlying conduct.

*McMaster v. Cabinet for Human Res.*, 824 F.2d 518, 521–22 (6th Cir. 1987). So too here. Jones's real dispute is with Progressive firing him. He can and, here, does challenge that conduct directly. The Court declines a ruling that would allow any plaintiff disputing his discharge to multiply his claims simply by seeking unemployment. Under Jones's theory, an employer with a good-faith dispute regarding a discharge would be whipsawed between the unlawful use of proceedings tort and state-mandated reporting. Consider this: to avoid a wrongful use of proceedings claim and, given the state requirement, an employer would have to either (A) report a non-misconduct termination basis (as Jones evidently believes Progressive should have done)—thereby bolstering any direct challenge to the discharge—or (B) keep silent and face a state misdemeanor charge. *See Christian v. Wal-Mart Stores, Inc.*, No. 07-14482, 2009 WL 349693, at *7 (E.D. Mich. Feb. 10, 2009) ("Contradictions or inconsistencies in an employer's explanations for termination can support a finding of pretext."); KRS 341.990(6)(b) ("Any person who willfully fails or refuses to furnish any reports required . . . shall be guilty of a Class B misdemeanor."). The Court rejects the regime Jones proposes.

good cause to terminate him. *Prewitt*, 777 S.W.2d at 894; *see also* KRS 341.370(1) ("A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which: . . . (b) He has been discharged for misconduct or dishonesty connected with his most recent work."). The Court finds that Jones, as a matter of law, failed to show a lack of probable cause. Accordingly, and for each of these reasons, the Court dismisses the wrongful use of proceedings claim.

### H.  Negligence *Per Se* – Count XII

In the Commonwealth, "negligence per se is merely a negligent claim with a statutory standard of care substituted for the common law standard of care." *Pile v. City of Brandenburg*, 215 S.W.3d 36, 41 (Ky. 2006) (citation omitted). Kentucky has codified the doctrine. *See* KRS 446.070. The statute:

> creates a private right of action under which a damaged party may sue for a violation of a statutory standard of care, provided that three prerequisites are met: **first**, the statute in question must be penal in nature or provide no inclusive civil remedy; **second**, the party must be within the class of persons the statute is intended to protect; and **third**, the plaintiff's injury must be of the type that the statute was designed to prevent.

*Hickey v. Gen. Elec. Co.*, 539 S.W.3d 19, 23–24 (Ky. 2018) (emphasis in original) (quoting *Vanhook v. Somerset Health Facilities, LP*, 67 F.Supp.3d 810, 819 (E.D. Ky. 2014)). The state's highest court recently held that a KRS 446.070 claim premised on "an alleged violation of KRS 341.990(6)(a) is cognizable under Kentucky law." *Id.* at 25. Thus, the Court turns to the duty-setting provision.

Per KRS 341.990, a person must not "knowingly" make a "false statement or representation of a material fact" or fail "to disclose [a] material fact to prevent or reduce the payment of benefits to any worker entitled thereto[.]" KRS 341.990(6)(a). Plaintiff claims that "Progressive challenged Mr. Jones'[s] entitlement to benefits when it had no

basis to do so." DE 64 at 32. Progressive's only arguable "challenge[,]" to Jones's unemployment benefits, as a regulatory matter, was the previously described third-party (and statutorily-mandated) submission of its explanation for Jones's termination. Yet, as explained, Jones presents no evidence sufficient for a reasonable juror to find that Progressive's conduct issued from anything other than an honest belief in a legitimate termination basis. The at-issue submission merely explained Progressive's rationale and provided supporting documentation. Again, an employee that "has been discharged for misconduct or dishonesty connected with his most recent work" is disqualified from receiving benefits. KRS 341.370(1). Given Progressive's unrebutted honest belief in Jones's dishonesty, Plaintiff failed to show that Progressive knowingly sought to "prevent or reduce the payment of benefits to any worker **entitled thereto**[.]" KRS 341.990(6)(a).

Jones acknowledges that a *Hickey* claim hangs on "an employer's bad faith opposition to" an employee's claim. 539 S.W.3d at 23. Yet, Jones fails to anchor his claim with *proof* of bad faith. Indeed, the full record shows that Progressive conducted a good faith and thorough investigation, terminated Jones based on its resulting findings, and, per state law, reported the same to the Division.[37] Accordingly, the Court concludes that no reasonable juror could find that Progressive "knowingly" violated KRS 341.990(6)(a).[38]

---

[37] Jones, of course, disputes the conclusion Progressive reached. However, that is not proof that Progressive acted in bad faith in reaching or reporting its alternative conclusion. *Cf. CPC Livestock, LLC v. Fifth Third Bank, Inc.*, 495 B.R. 332, 344 (W.D. Ky. 2013) ("Good faith can be, and usually is, something less than perfection or complete accuracy, and above all, it means not to take advantage of, not to deceive, not to be underhanded." (internal quotation marks omitted) (quoting *Roehrig v. Merchs. & Businessmen's Mut. Ins. Co.*, 391 S.W.2d 369, 370 (Ky. 1965)))

[38] Given this result, and with a nod to comity, the Court declines to address Defendant's privilege argument. *See* DE 61-1 at 38–39. As the Court discussed in granting Jones leave

## I. Punitive Damages – Count XIII

Jones claims that "Kentucky law is quite clear that punitive damages must be pl[eaded] as a separate claim." DE 64 at 34. The Court disagrees.[39] But, in any event, Plaintiff does not identify (much less point to proof regarding) the essential elements of a Kentucky "punitive damages" cause of action. *See* DE 25 at ¶¶ 74; DE 64 at 34. Without even this minimal claim development—itself, insufficient to clear even the lower Rule 12 hurdle, *see Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) ("a formulaic recitation of the elements of a cause of action will not do")—Jones surely "fails to make a showing sufficient to establish the existence of an[y] element essential" to his case. *Celotex Corp.*, 106. S. Ct. at 2252. Thus, as a freestanding punitive damages cause, Count XIII fails as a matter of law. Particularly so at the summary judgment stage.

Based on the Complaint language, Jones could be trying to assert a common law gross negligence claim. *See* DE 25 at ¶ 74. Such a claim, if successful, would permit a punitive damages **recovery**. *See Williams v. Wilson*, 972 S.W.2d 260, 262–63 (Ky. 1998) (describing development of Kentucky gross negligence law as a mechanism for recovery of punitive damages). Kentucky gross negligence has two elements: (1) "failure to

---

to amend, a ruling for Progressive on the privilege issue could have eviscerating implications for the nascent *Hickey* tort. *See* DE 24 at 4–5 (Op. & Order).

[39] Certainly, one Kentucky appellate panel has said as much. *See Chesley v. Abbott*, 524 S.W.3d 471, 480 (Ky. Ct. App. 2017), *review denied* (Aug. 16, 2017). However, Kentucky's highest court has consistently characterized punitive damages as a remedy, rather than a separate cause of action. *See, e.g.*, *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985) ("The concept of permitting punitive damages in addition to compensatory damages is one of longstanding in Kentucky."). The *Chesley* court relied on the Supreme Court of Kentucky's *MV Transp. Inc.* decision for its holding. *Chesley*, 524 S.W.3d at 481 (quoting *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 341 (Ky. 2014)) Yet, *MV Transp.* did not hold that Kentucky has a separate "punitive damages" cause of action but remanded for a retrial on a punitive damages *remedy*. *See, e.g.*, 433 S.W.3d at 341. The Commonwealth may well recognize freestanding punitive damages claims, but state precedent is hardly "clear" on this point.

exercise reasonable care" and (2) "that [such] negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013). Plaintiff offers zero proof in support of (or legal argument substantiating) either claim element. Finally, punitive damages are not available as a remedy for Jones's sole surviving FMLA cause of action.[40] Thus, whether the Court construes Count XIII as a standalone punitive damages claim, a common law gross negligence cause of action, or a proposed remedy for his other claims, Jones failed to show a triable issue of fact. Accordingly, the Court dismisses Count XIII.

## IV. CONCLUSION

For the reasons, to the extent, and on the terms stated, the Court **GRANTS IN PART** and **DENIES IN PART** DE 61 and **ORDERS** as follows:

1. The Court, pursuant to the parties' undisputed agreement, **DISMISSES** all claims against Progressive Specialty Insurance Agency, Inc., **WITH PREJUDICE**; and

2. The Court dismisses Plaintiff's Counts II–XIII **WITH PREJUDICE**. The interference claim, alone, persists.

---

[40] *See, e.g.*, 29 U.S.C. § 2617; *Arrigo v. Link*, 836 F.3d 787, 798 (7th Cir. 2016) ("FMLA damages don't include emotional distress and punitive damages[.]"); *Carroll v. Potter*, No. CIV.A. 3:05-CV-108-S, 2007 WL 3342298, at *3 (W.D. Ky. Nov. 7, 2007) ("Other kinds of damages, including punitive damages and damages for emotional distress, are not recoverable under the FMLA. *Rosanio v. Taco Bell of America, Inc.*, 303 F.Supp.2d 878 (N.D. Ohio 2004); *Johnson* [*v. Honda of America Mfg., Inc.*, 221 F.Supp.2d 853, 858 (S.D. Ohio 2002).]"); *cf. Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1007 (6th Cir. 2005) (joining circuits holding emotional distress damages non-recoverable based on exclusivity of the FMLA damages provisions).

This the 24th day of September, 2019.

Signed By:

*Robert E. Wier*

United States District Judge